UNITED STATES *v.* HUDSON SHIPPING CO., INC., BARRE FOOTWEAR CO.
(No. 5091)\*

\*(C.A.D. 802).

United States Court of Customs and Patent Appeals, May 4, 1962

*William H. Orrick, Jr.*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section, for the United States.
*Barnes, Richardson & Colburn (Joseph Schwartz*, of counsel) for appellees.

[Oral argument February 7, 1962, by Mr. FitzGibbon and Mr. Schwartz]

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK [1]

SMITH, Judge, delivered the opinion of the court:

The United States Customs Court, in sustaining the protest of the importers, held that the imported conveyor, now installed in a shoe factory, was "shoe machinery" and as such was free of duty under the provisions of paragraph 1643 of the Tariff Act of 1930 (C.D. 2279). The Government has appealed.

The Government here contends that the conveyor was properly classified by the Collector of Customs as an article having as an essential feature an electrical element or device and assessed with duty at the rate of 13¾ per centum ad valorem under the provisions of paragraph 353 of said Act as modified by the Torquay Protocol to GATT, T.D. 52739.

The conveyor in issue was manufactured by the Durkoppwerke of Germany and is further identified as a "Class 750 GP" conveyor. It consists essentially of a frame which supports upper and lower tracks over which metal transport containers or tote boxes are conveyed either to a selected work station or to a feeding point from any of the work stations. The tote boxes are conveyed along the upper track to the individual work stations and are returned over the lower track from the work stations to the feeding point. Tote boxes moving along the upper track are delivered to any selected work station as determined by a supervisor or feeder who operates the conveyor indicator board. In this way, a tote box may be selectively delivered at any one of the work positions extending on each side along the length of the conveyor. After the work operation at a particular work station has been performed, the work pieces from that station are placed in a tote box which, when filled, is returned to the feeding point over the lower track. The function of the imported conveyor when installed in a shoe factory is solely to convey parts of shoes in the process of manufacture to and from the separate stations. The conveyor mechanism per se moves and delivers tote boxes. What it moves and delivers to

[1] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell*, pursuant to provisions of Section 294(d), Title 28, United States Code.

the manufacturing stations depends on what is loaded in the tote boxes. Thus it functions as a general purpose conveyor.

While the particular conveyor at bar is used in a shoe factory, the witness for the Government stated that he had seen similar types of conveyors used in the textile industry to convey textile materials.

The testimony and exhibit show that the conveyor is a general purpose unit which may be used irrespective of the particular end product produced, in factories of various types where successive manufacturing steps are carried out at separate work stations. Plaintiff's illustrative Exhibit 1 is a sales brochure primarily concerned with a conveyor system with centralized control for the shoe industry, which is distributed in the name of the manufacturer of the imported "Durkopp" conveyor. This brochure states:

DURKOPP Conveyor Systems
ensure increase productivity by improving the process of manufacture.
They can be adapted to suit the layout and production requirements of *any* factory and workshop.

\* \* \* \* \* \* \*

If need be, *different articles* can be manufactured simultaneously, without interfering with each other. The arrangement of the machines etc. in the general layout is immaterial, which means that:

New orders can be put into work at once—

irrespective of whether large or small quantities are involved

irrespective also of the sewing processes necessary for each model and of the order in which these must be carried out (provided, of course, that the appropriate machine is incorporated in the layout).

The DURKOPP Conveyor System Class 750 GP is adaptable therefore to *any type and volume of production*. [Emphasis added.]

It is, however, the contention of appellees, as stated in their brief that:

Since the conveyor systems are part of an integrated, assembly line system of shoe production, they fall within the letter and spirit of the term "shoe machinery" as used in Par. 1643 even though they perform no actual shoe fabricating operation.

The issue thus presented requires that we determine whether the imported machine is within the term "shoe machinery" as used in the Free List, paragraph 1643 of the Tariff Act of 1930. The identical paragraph was before this court in *United States* v. *Laing Harrar & Chamberlin*, 21 CCPA 235, T.D. 46763, where it was decided that a shoe stretcher was not entitled to free entry as "shoe machinery." The court said (pp. 238–239) :

We do not believe that the device at bar is a shoe machine or that it falls within said provision for "shoe machinery." In enacting the provision in controversy we conclude that Congress could not have had in contemplation every kind of machine that had anything to do with a shoe. It is probable that Congress, in

putting shoe machinery on the free list, was prompted largely by a desire to cheapen the products of such machinery in this country.

The Customs Court in its opinion refers to the decisions in *P. H. Petry Co.* v. *United States,* 40 Cust. Ct. 443, Abstract 61541, and *Geo. H. Diebel, Jr.* v. *United States,* 29 Treas. Dec. 29, T.D. 35589, wherein certain specialized machines were held to be included within the term "shoe machinery" even though the machines in issue did not actually fabricate shoes. In the first case, the machine, called a "Linham Pattern Grading Machine," operated from a master shoe pattern to reproduce that pattern with the variations required therein to accommodate the various sizes and widths required in the finished shoes. In the second case, the machine was a "skiving machine" which beveled the edges of leather pieces which were to be joined by gluing or sewing so that when joined the leather parts would be of substantially uniform thickness. Thus, while these machines did not actually fabricate the shoes, they performed operations directly related to the manufacture of shoes.

In determining the intent of Congress where, as here, the meaning of particular words in the Tariff Act are involved, we refer to pertinent tariff information which Congress presumably had before it when enacting the particular paragraph in issue.

The Tariff Act of 1913, paragraph 441, as well as the Tariff Act of 1922, paragraph 1542, included shoe machinery on the Free List. The Tariff Information Survey of 1921 for the use of the Ways and Means Committee of the House, in considering the then proposed Bill which became the Tariff Act of 1922, and with respect to paragraph 441 of the Tariff Act of 1913 which provided for "shoe machinery" on the Free List of that Act, contains the following:

### GENERAL INFORMATION

Act of 1913, paragraph 441.—* * * shoe machinery * * *. Free.

### DESCRIPTION

Shoe machinery includes a large variety of machines used in the manufacture of shoes from the cutting of the upper to the finished article. There are many types of shoes, differing not only in outward characteristics, but more essentially in the method of manufacture, such as welt shoes, McKay sewed, turned, stitch downs, nailed, screwed, pegged, and others. In general, numerous operations, sometimes as many as 50, are performed on each shoe. Most of these are machine operations. The sewing machine, modified for different operations, is the most widely used for working on the uppers; for bottoming, the machines are usually more highly complicated and specialized. Some of the trimming and finishing machines are small and light, while others, such as those for compressing the heels, are large and heavy.

What is essentially an abstract of the above provision is found in the Summary of Tariff Information, 1929, at page 2254. ■ Congress, in using the term "shoe machinery" in paragraph 1643 of the Tariff Act of 1930, having before it the foregoing Summaries of Tariff Infor-

mation, appears to us to have intended to cover specialized machines particularly adapted for and used in the manufacture of shoes, of which the pattern reproducing machine of the *Petry* case, and the skiving machine of the *Diehl* case, are examples.

However, we do not think Congress intended to put on the free list all machinery which might be used in a shoe factory. To hold that a conveyor system, adaptable to many types of production line manufacture, installed in a shoe factory thereby becomes "shoe machinery" seems to us to exceed limitations which Congress intended by its use of the term "shoe machinery." Appellees' position rests upon the premise that since the conveyor is a part of an assembly line for manufacturing shoes, it comes within the term "shoe machinery." We do not think this is a proper premise. It fails to recognize the limitations we think Congress intended by its use of the term "shoe machinery" as above indicated. To hold that the rate of duty on a conveyor depends upon the kind of factory in which it is used would subject the same machine to different rates of duty. We do not think such a result was intended by the Congress. We therefore reject appellees' assertions.

A general purpose conveyor does not, in our opinion, lose its identity as such nor become "shoe machinery" merely because it happens to have been installed in a shoe factory. Its function remains that of a conveyor which moves work pieces from place to place within a factory. The identical conveyor with its set up of multiple work stations also can be used in manufacturing many items other than shoes.

For the foregoing reasons, we *reverse* the judgment of the Customs Court.

MARTIN, J., sat but did not participate because of illness.